## Tuttle v. Irvine Construction Co.'s Receiver.

(Decided March 23, 1934.)

SHUMATE & SHUMATE for appellant.
CLARENCE MILLER for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

On the 17th day of September, 1932, A. M. Clark, receiver of the Irvine Construction Company, submitted in writing, to Homer Tuttle, a proposition to rent him certain machinery, belonging to the Irvine Construction Company, for use in the construction of a section of the highway at Paint Lick, Ky. The machinery consisted of a Good Roads rock crusher, Erie steam shovel, Ingersoll Rand air compressor, scales, and other small tools. The proposition fixed the rental at $250 per month on the basis of a job of 120 days. At the end of the rental period, the machinery was to be returned to Irvine, Ky., or an equal distance, if some point other than Irvine was indicated by Clark. Tuttle took possession of the machinery and used it in the discharge of his contract with the state highway commission until the rental amounted to $1,000. On his refusal to pay the $1,000, Clark instituted this action to recover the same and $349.46, the amount asserted in the petition to be due for the cost of reloading the machinery and its return to Irvine or some ponit designated by Clark.

Tuttle traversed the petition as it relates to the $349.46, cost of returning the machinery to Irvine, and further alleged he had turned it over to the receiver at a point indicated by him and at which the latter had

accepted it, and for this reason he was not entitled to recover the $349.46. No recovery was allowed for this item. It is not involved on this appeal. To escape his liability for the $1,000 rental, Tuttle traversed the petition and pleaded the contract was in writing. The terms and provisions as alleged by him, though in writing, are identical with those declared on in the petition. An examination of it discloses it is the proposition in writing signed by the receiver proposing to rent the machinery. Also, he set up the amounts expended by him for material and supplies, which he averred he had added to the machinery after he took possession of it, together with freight expended for the transportation of the added material and supplies, aggregating $884.12. A motion to strike was sustained to so much of his answer as itemized his expenditures for material, supplies, and freight. By an amendment he restated the items expended for material, supplies, and freight, and charged that he was under a contract with the state highway commission to construct a certain road in Madison county within a definite period of time, and Clark knew the purpose for which he was renting the machinery and the machinery was not competent to perform the work, but that he (Tuttle) did not know, at the time he rented it, of its "dilapidated condition"; it was worn out, and parts of it were completely missing, and its condition required the added material and supplies to render it suitable to perform the work for which he had rented it. He uses this language:

> "The defendant further states that the plaintiff warranted said machinery to be in proper condition to perform said work and the defendant did not have access to other machinery with which to perform the contract with the Highway Commission and he was therefore compelled to use said machinery."

To the answer and counterclaim thus amended, the court sustained a demurrer. A third amendment was filed, in which he again itemized the cost of the material, supplies, and freight, and reiterated the charge the same were necessary to put the machinery in proper condition to perform the work for which he rented it, and also it "required lots of replacements, repairs and labor to be done in order to perform the work for which he leased it and it was in good state of repair when he turned same over to the plaintiff after he completed the

job.'' He set forth that after the job was completed he delivered it to Clark at a point other than Irvine, and Clark accepted the same at a point other than Irvine. In the fourth paragraph of the second amendment, he adopted the paragraphs of the original and second amended answer and counterclaim, the substance of which is set out above, and further alleged ''all of said parts he put upon said machinery can be taken away from said machinery without impairing the value of the rest of the parts of the said machinery and the only loss to said machinery would be the loss of the actual parts so taken from same.'' He further pleaded that he had paid to Clark on December 14, 1932, $100 cash, and ''prior thereto, $50.00 by check,'' and another sum of $100, less the telephone bill of $13—in all $237 on the rental of the machinery. He asserted that, if he were not entitled to the credits for the material, supplies, and freight listed, ''then he is entitled to have and receive all parts of the machinery, which he placed upon same.''

An examination of Tuttle's pleadings as to the items of cost of material, supplies, and freight, as they are set out in his answer and counterclaim as amended, when read in connection with his allegation relating to detaching and removing either material or supplies, fails to disclose any facts showing any material or supplies, or parts thereof, removable from the rented machinery. He merely states his opinion the material and supplies added to the rented machinery ''can be taken away'' from it ''without impairing the value of the rest of its parts.'' No facts are pleaded upon which the pleader based his opinion that the parts added are removable without injury to the machinery, or that the parts added described in the pleading were of a character that might be detached without injury to the machinery to which the same were added. The authorities are not agreed as to the right of the bailee for hire or machinery, as in this case, to charge and collect of the bailor for repairs. The general rule seems to be that, in the absence of a statute or a contract to the contrary, a bailor is responsible for extraordinary repairs which inure to his benefit, and which were not caused through the fault and neglect of the bailee, but the bailee must bear the expense of repairs which are ordinary and incidental to the use of the thing bailed. The bailee for hire, where the use of the thing bailed is the essence of the contract, impliedly undertakes to keep the thing in repair and

must bear such expenses as are incidental thereto, unless the necessity for them arises from some defect in the thing against which the bailor has expressly or impliedly warranted. Only extraordinary expenses are chargeable to the bailor, and the bailee may compel reimbursement for them. Williamson v. Phillipoff, 66 Fla. 549, 64 So. 269, 52 L. R. A. (N. S.) 412. The bailor for hire under the civil law was generally bound to keep the subject of bailment in a state of repair suitable for use (Central Trust Co. of New York v. Wabash, St. L. & P. R. Co. [C. C.] 50 F. 857), but, at common law, the general rule is, in the absence of a statute or an express contract, the question as to which party is bound for repairs generally depends upon custom, usage, and the character of the article of bailment. A contract of bailment may expressly stipulate with respect as to who shall make repairs, and, of course, is binding when entered into. Riley v. Lowry, 63 Hun, 632, 18 N. Y. S. 299; J.T. Stark Grain Co. v. Automatic Weighing Machine Co., 81 Ark. 609, 99 S. W. 1103; Pacific Bridge Co. v. Riverside Rock Co., 70 Or. 337, 141 P. 751.

In 3 R. C. L. sec. 34, page 111, the prevailing rule is aptly and illustratively stated thus:

"In the case of a hired animal, if it falls sick or becomes exhausted the hirer is bound not to use it, and if he does pursue his journey and use it when reasonable care and attention would forbid, he makes himself responsible to the owner for that act. In such an emergency, instead of using the animal, the law requires the bailee either himself to be discreet in the treatment of the afflicted brute, and in extremity to call in some farrier or expert, when, it would seem, the hirer becomes ex necessitate the agent of the owner invested with implied authority to bind the bailor for such expense as may reasonably be incurred, or he must inform his bailor promptly of the state of affairs, and thereby throw directly on him the responsibility of caring for or preserving the property. So if a bailee for hire acquires knowledge of a dangerous defect in the thing bailed arising after the bailment he has no right further to rely on the bailor's statement that the thing bailed was all right and in good condition at the time of the bailment, but, acquiring such knowledge, he must discontinue the use of the thing bailed, and repair it himself, or inform the bailor

of the defect, and thus put the responsibility on him. If he does not do this and continues the use of the thing bailed in its dangerous condition, he is guilty of negligence, although the condition of the thing bailed in other respects may have been bad at the time the bailment was made.''

See Higman v. Camody, 112 Ala. 267, 20 So. 480, 57 Am. St. Rep. 33; Williamson v. Phillipoff, 66 Fla. 549, 64 So. 269, 52 L. R. A. (N. S.) 412, and note; Davis v. McConnell (La. App.) 146 So. 54; Koenig v. Leppert-Roos Fur Co. (Mo. App.) 260 S. W. 756; Cole v. Cole's Adm'r, 4 Bibb, 340; Reeder v. Anderson's Adm'rs, 4 Dana, 193. The rule stated in R. C. L., supra, is in harmony with the identical principle frequently recognized by this court, i. e., that a tenant is not entitled to recover for money spent for repairs in the absence of a statute or a contract. Sevier v. Bona, 217 Ky. 835, 290 S. W. 683; Richmond v. Standard Elkhorn Coal Co., 222 Ky. 150, 300 S. W. 359, 58 A. L. R. 1423; Ernst v. Pike, 232 Ky. 680, 24 S. W. (2d) 553; Consolidated Coal Co. v. Zarvis, 222 Ky. 238, 300 S. W. 615, 58 A. L. R. 1430; Thomas v. Conrad, 114 Ky. 841, 71 S. W. 903, 24 Ky. Law Rep. 1630; King & Metzer v. Cassell, 150 Ky. 537, 150 S. W. 682, 42 L. R. A. (N. S.) 774.

Clark, as receiver, pendente lite, rented the machinery to Tuttle. As receiver, his authority to act in renting it was derived from the order of the court, which does not appear in the record. At the time it was rented according to the allegations of the answer and counterclaim of Tuttle, ''the machinery was in a very bad worn condition and many of its parts were broken down.'' It was known to the parties to the rental contract that the machinery was second-hand. They had the right to enter into a rental contract for the badly worn, broken down machinery and to agree on the rental price for its use, and bind Tuttle to return the same at the expiration of the contract. His pleading clearly shows, if Tuttle had no knowledge of the worn out, broken down condition of the machinery at the time he rented it, he had immediate knowledge thereof, before he took possession. It was then his duty to accept or reject it, and notify Clark, and demand the restoring or the repairing of it to make it comply with the rental contract. It is not charged by him that any representations or statements were made by the receiver as to the fitness of the machinery for the pur-

pose, for which it was rented; and that he thereafter acquired knowledge of its condition; or that he gave notice to the receiver of its unfit condition to perform the work for which it was rented, after he acquired knowledge of its condition, and thus put the responsibility upon him for repairs. Aside from this, no facts are alleged tending to show the material and supplies added by Tuttle to the machinery were extraordinary, within the legal significance of this term, considering the alleged worn condition of the machinery at the time it was rented.

The answer and counterclaim as amended fail to allege facts bringing the counterclaim of Tuttle within the principles herein reiterated. However, it contains a list of the payments of Tuttle on the rental contract aggregating $237 which, when deducted from the $1,000 claimed in the petition, leaves $763, whereas judgment was entered for $884.12, or $121.12 in excess of the amount due the receiver.

The judgment is reversed, with directions to credit the $1,000 by the $100 paid on December 14, 1932, the $50 by check, and the $100, less $13 telephone bill, as of the date of their respective payments.

Wherefore, to this extent the judgment is reversed.